Filed 12/18/17

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

----

| | |
|---|---|
| ANTOINETTE ROSSETTA, | C078916 |
| Plaintiff and Appellant, | (Super. Ct. No. CU14-080227) |
| v. | |
| CITIMORTGAGE, INC. et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Nevada County, Thomas M. Anderson, Judge. Affirmed in part and reversed in part.

United Law Center, Danny A. Barak and Jonathan A. Sanders for Plaintiff and Appellant.

Aldridge Pite, Duncun Peterson, Christopher L. Peterson, Danielle M. Graham and Cuong M. Nguyen for Defendants and Respondents.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion, with the exception of parts A, B, C, D, E, G, and H of the discussion, is certified for publication.

1

Plaintiff Antoinette Rossetta appeals from a judgment dismissing her second amended complaint[1] after the trial court sustained a demurrer by defendants CitiMortgage, Inc. (CitiMortgage) and U.S. Bank National Association as Trustee for Citicorp Residential Trust Series 2006-1 (2006-1 Trust).  The complaint asserts causes of action for intentional misrepresentation, negligent misrepresentation, breach of contract, promissory estoppel, negligence, intentional infliction of emotional distress, and unlawful business practices in violation of the Unfair Competition Law arising from loan modification negotiations spanning more than two years.  Rossetta also appeals from the trial court's dismissal of a cause of action for conversion that appeared in an earlier iteration of the complaint to which CitiMortgage and the 2006-1 Trust (collectively, CitiMortgage, unless otherwise indicated) also successfully demurred.

We conclude (1) the trial court erred in sustaining the demurrer to the causes of action for negligence and violations of the Unfair Competition Law, (2) the trial court properly sustained the demurrer to the causes of action for intentional misrepresentation and promissory estoppel, but should have granted leave to amend to give Rossetta an opportunity to state a viable cause of action based on an alleged oral promise to provide her with a Trial Period Plan (TPP) under the Home Affordable Mortgage Program (HAMP) in April 2012, and (3) the trial court properly sustained the demurrer to the causes of action for negligent misrepresentation, breach of contract, intentional infliction of emotional distress and conversion without leave to amend.  Accordingly, we affirm in part and reverse in part.

---

[1] Unless otherwise indicated, all subsequent references to the "complaint," are to the second amended complaint filed on August 11, 2014.

# I. BACKGROUND

## A.     *The Loan and Deed of Trust*

Rossetta purchased a home in Grass Valley in 2001.  She refinanced the purchase through American Brokers Conduit (ABC) in 2005.[2]  The new loan was secured by a deed of trust designating Mortgage Electronic Registration Systems, Inc. (MERS) as the beneficiary acting as the nominee for ABC and ABC's successors and assigns.[3]  The loan was subsequently sold to CitiMortgage.[4]

Although CitiMortgage started accepting Rossetta's mortgage payments in March 2006, MERS did not record an assignment of deed of trust until October 12, 2012.  As we shall discuss, Rossetta challenges the assignment of the deed of trust.

## B.     *Rossetta Defaults*

Rossetta was laid off from her job on or about March 1, 2010.  Approximately two weeks later, she learned she had a recurrence of breast cancer.  Rossetta made complete payments on her mortgage during this difficult period using severance pay from her former job.  In May 2010, Rossetta contacted CitiMortgage to discuss other options.  According to the complaint, Rossetta "was told that [CitiMortgage] would be unable to

---

[2] ABC is not a party to this appeal.

[3] " 'MERS is a private corporation that administers a national registry of real estate debt interest transactions.  Members of the MERS System assign limited interests in the real property to MERS, which is listed as a grantee in the official records of local governments, but the members retain the promissory notes and mortgage servicing rights.  The notes may thereafter be transferred among members without requiring recordation in the public records. [Citation.]  [¶]  Ordinarily, the owner of a promissory note secured by a deed of trust is designated as the beneficiary of the deed of trust. [Citation.]  Under the MERS System, however, MERS is designated as the beneficiary in deeds of trust, acting as "nominee" for the lender, and granted the authority to exercise legal rights of the lender.' " (*Saterbak v. JPMorgan Chase, N.A.* (2016) 245 Cal.App.4th 808, 816, fn. 6.)

[4] The operative complaint alleges that CitiMortgage was "the servicer of the Subject Loan."

3

assist her unless she was at least three months delinquent in her monthly mortgage payments, and thus in default."

Rossetta went into default in June 2010. Around the same time, she executed a power of attorney authorizing her fiancé, Brian Roat, to act on her behalf.

*C.     Rossetta Attempts to Secure a Loan Modification*

Rossetta or Roat telephoned CitiMortgage in July 2010. Either Rosetta or Roat spoke with a CitiMortgage representative named Brian (last name unknown) or Charlie Welch. The representative told Rossetta or Roat that "nothing could be done to assist [Rossetta] with a HAMP loan modification until she was three months delinquent and therefore in [d]efault."[5] On July 23, 2010, Rossetta received a letter from CitiMortgage stating she was not eligible for a HAMP modification because " 'default is not imminent.' " By then, however, Rossetta was already in default, and had even received correspondence to this effect from CitiMortgage.

Roat telephoned CitiMortgage again on August 1, 2010. A customer service representative collected basic information from Roat and informed him that Rossetta may now qualify for a HAMP modification. The following day, Rossetta received an electronic communication from CitiMortgage regarding a permanent loan modification. The complaint describes the communication as an email, and attaches a copy as Exhibit B.

The complaint alleges: "[Rossetta] has attached as Exhibit 'B' an email from [CitiMortgage] stating the specific terms of the permanent loan modification agreement." Elsewhere, the complaint alleges: "[O]n August 2, 2014[,] [CitiMortgage] emailed [Rossetta that] the terms of the permanent loan modification were as follows: (1) 480 month term; (2) .02% interest rate; (3) a principal reduction in the amount of $95,477.81.

---

[5] We describe the relevant features of HAMP below.

4

(See Exhibit 'B').  The email also stated that the loan modification documents were being sent to [Rossetta]."  As we shall discuss, Exhibit B does not support Rossetta's characterization.

On August 3, 2010, Rossetta spoke with Helen, a CitiMortgage representative who declined to give her last name.  The complaint is ambiguous as to what, precisely, Helen said.  At one point, the complaint suggests that Helen told Rossetta "she was approved for a trial plan modification and a permanent loan modification upon successful completion of the trial plan payments."  Later, the complaint suggests that Helen told Rossetta she "would be approved for a permanent loan medication [*sic*] upon completion of the trial modification plan payments/repayment plan payments."  Later still, the complaint suggests that Helen told Rossetta "she was approved for a HAMP loan modification."

On August 9, 2010, CitiMortgage sent Rossetta a letter stating, in part:  "Your request for a repayment plan has been approved."  The letter attaches an agreement contemplating three monthly payments of $1,209 for September, October and November 2010.  Rossetta agreed to the terms of the repayment plan on August 15, 2010.  Neither the letter nor accompanying agreement makes any mention of HAMP or any other loan modification program.  Nevertheless, the complaint alleges that Rossetta believed she would receive a permanent loan modification upon completion of the repayment plan.

Rossetta made the three monthly payments contemplated by the repayment plan. She did not receive a permanent loan modification.  When Rossetta approached CitiMortgage, she was told to continue making monthly payments of $1,209.

On January 3, 2011, Rossetta received a letter from CitiMortgage stating that her application for a HAMP modification had been denied for failure to provide necessary documentation.  Rossetta alleges she provided all requested documents.  She also alleges that CitiMortgage lost or mishandled her loan modification application, causing significant delays and increasing fees and penalties.

Around this time, Roat spoke with an unidentified CitiMortgage representative and learned that Rossetta's application was denied because she failed to produce a statement from the State of California declaring her permanently disabled. Rossetta contends the State of California does not issue such a statement, adding that "[CitiMortgage] requested a nonexistent document to further delay the process and frustrate [Rossetta]."

Rossetta entered into forbearance agreements with CitiMortgage in January and February 2011. She applied for another HAMP modification in July 2011. Rossetta alleges that CitiMortgage requested the same documents over and over again, confirming her suspicion that application materials had been misplaced or mishandled. Among other things, Rossetta notes that CitiMortgage demanded she produce her entire loan application on two separate occasions, requesting duplicates of other previously submitted documents by fax. Rossetta alleges she promptly responded to all such requests. She further alleges that CitiMortgage lost or mishandled her documents, delaying the loan modification process and causing her harm.

Rossetta's personal circumstances changed during the pendency of the application. Specifically, she stopped receiving disability insurance and began receiving unemployment insurance. As a result, CitiMortgage demanded that Rossetta submit a new application and supporting documents. Rossetta complied and submitted the requested documents on October 12, 2011.

On November 1, 2011, Rossetta returned to work at a reduced salary. Once again, the change in circumstances prompted a demand for additional documents. Once again, Rossetta complied.

On January 18, 2012, Rossetta received a letter stating that her application for a HAMP modification had been denied. This time, Rossetta was told that she had an excessive forbearance amount ($33,000) on her account. Rossetta alleges the forbearance

amount would have been significantly less had she been given a permanent loan modification "over a year earlier as had been represented."

Rossetta continued to seek mortgage relief. On April 6, 2012, Roat spoke with CitiMortgage representative Konnor Sincox. According to the complaint, Sincox told Roat that Rossetta "was approved for another trial loan modification and that upon completion, [she] would receive a permanent loan modification with a 2% fixed interest rate for five years and a principal reduction." Elsewhere, the complaint alleges that Sincox represented that Rossetta "had been approved for another trial loan modification and that she would receive it as soon as the loan modification application and required documents were received from [her]." Although Sincox did not specifically say so, Rossetta believed she would be receiving a trial period plan under HAMP (HAMP TPP), as she had previously been under consideration for a HAMP modification. According to the complaint, "Sincox indicated that the loan modification documentation would not be provided in advance, but rather, would come after the trial payment period."

Following Roat's conversation with Sincox, Rossetta once again sent the requested documents. Despite Roat's conversation with Sincox, CitiMortgage never sent Rossetta a HAMP TPP or permanent loan modification agreement. According to the complaint, Rossetta and Roat continued their effort to obtain a permanent loan modification for the rest of the year, without success. Rossetta filed for bankruptcy protection in December 2012.

D.      *Assignment of Deed of Trust*

On October 12, 2012, MERS assigned its interest in the deed of trust to CitiMortgage. Approximately one year later, Rossetta commissioned a "forensic audit" of the loan. According to the complaint, "[t]he audit revealed that the Assignment of Deed of Trust to [d]efendant [CitiMortgage] was invalid as void because the [2006-1 Trust] had a closing date of August 30, 2006." Although the first amended complaint and second amended complaint identify the 2006-1 Trust as a "purported beneficiary of the

7

[s]ubject [l]oan," neither pleading alleges that CitiMortgage or any other entity ever attempted to assign the loan to the 2006-1 Trust.

CitiMortgage assigned the deed of trust to U.S Bank National Association, as Trustee for Prof-2013-M4 REMIC Trust I (M4 REMIC Trust 1) on April 1, 2012. Rossetta challenges the assignment from CitiMortgage to the M4 REMIC Trust 1 on the sole ground that the earlier assignment from MERS to CitiMortgage was void.

E.      *The Instant Action*

Rossetta commenced this action against CitiMortgage and its successor in interest, Fay Servicing, LLC (Fay) on January 27, 2014.[6]  Rossetta filed a first amended complaint on April 24, 2014.  The first amended complaint asserted causes of action for intentional misrepresentation, negligent misrepresentation, breach of contract, promissory estoppel, negligence, intentional infliction of emotional distress, conversion, violations of the Unfair Competition Law and conspiracy.  The first amended complaint also sought declaratory relief.[7]  CitiMortgage demurred.

The trial court sustained the demurrer without leave to amend as to the cause of action for conversion and request for declaratory relief, both of which were based on the allegation that the assignment of the deed of trust to CitiMortgage was void.  The trial court sustained the demurrer to Rossetta's remaining causes of action with leave to amend, observing:

---

[6] During the pendency of this appeal, the parties filed a stipulation and request for dismissal as to Fay and M4 REMIC Trust 1, which we have granted.

[7] "Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration."  (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 510-511.)

8

"[T]he tenor of the demurrer is not so much what the pleading says, as what it does not.  Plaintiff's counsel, who successfully prevailed in *Bushell v. JPMorgan Chase Bank, N.A.* (2013) 220 Cal.App.4th 915 [(*Bushell*)], cited by them in their opposition, is certainly conversant about the requirements of pleading a similar case such as this one.  Notwithstanding, the allegations here fail to properly differentiate between and/or connect the trial payment plans and forbearance agreements alleged with HAMP modification, rendering analysis incomplete because the parties and court cannot determine if, for example, the *Bushell* / *West* [*v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780 (*West*)] line of cases applies (HAMP cases) or whether the analysis must be done without reference to HAMP under traditional common law principles.  As argued by the defendants, forbearance plans do not create a binding contract for modification.  Of course, this Court cannot determine whether such obscurity is intentional or inadvertent.  However, in permitting amendment, the Court can state its expectation that plaintiff clearly set forth the context of each representation and agreement in any further pleading, or risk suffering the conclusion that further amendment would be pointless."  (Italics added.)

Rossetta filed the operative complaint on August 11, 2014.  As noted, the complaint asserts causes of action for intentional misrepresentation, negligent misrepresentation, breach of contract, promissory estoppel, negligence, intentional infliction of emotional distress, violations of the Unfair Competition Law, and conspiracy.  CitiMortgage demurred to the complaint on September 15, 2014.  The trial court sustained the demurrer without leave to amend.  This appeal followed.

## II.  DISCUSSION

### A.    *Home Affordable Mortgage Program*

We begin with an overview of HAMP, which informs our analysis of the complaint.  "As authorized by Congress, the United States Department of the Treasury implemented [HAMP] to help homeowners avoid foreclosure during the housing market

9

crisis of 2008.  'The goal of HAMP is to provide relief to borrowers who have defaulted on their mortgage payments or who are likely to default by reducing mortgage payments to sustainable levels, without discharging any of the underlying debt.' " (*West, supra,* 214 Cal.App.4th at p. 785.)  Under HAMP, qualifying homeowners may obtain permanent loan modifications that reduce their mortgage payments.  (*Bushell, supra,* 220 Cal.App.4th at p. 923.)  Lenders receive incentives from the government for each HAMP modification.  (*Id.* at p. 923.)

HAMP Supplemental Directive No. 09-01, issued by the Department of the Treasury, sets forth eligibility requirements and modification procedures under HAMP. (U.S. Depart. Treasury, HAMP Supplemental Directive No. 09-01 (Apr. 6, 2009) pp. 2-18 (Supplemental Directive 09-01).)  Lenders must perform HAMP loan modifications in accordance with Treasury Department regulations.  (*West, supra,* 214 Cal.App.4th at p. 787; see also *Wigod v. Wells Fargo Bank, N.A.* (7th Cir. 2012) 673 F.3d 547, 556 (*Wigod*).)

Under Supplemental Directive 09-01, the lender initially determines whether a borrower satisfies certain threshold requirements regarding the amount of the loan balance, monthly payment, and owner occupancy.  (*West, supra,* 214 Cal.App.4th at pp. 787-788; *Wigod, supra,* 673 F.3d at pp. 556-557, 565; Supplemental Directive 09-01, *supra,* pp. 2-5, 8-10, 14-18.)  Once the lender determines that the borrower qualifies for HAMP (assuming the borrower's representations remain accurate), the lender implements a two stage process.  (*Rufini v. CitiMortgage, Inc.* (2014) 227 Cal.App.4th 299, 306 (*Rufini*); *Bushell, supra,* 220 Cal.App.4th at p. 923.)  In the first stage, the lender (1) provides the borrower with a HAMP TPP setting forth trial payment terms, (2) instructs the borrower to sign and return the HAMP TPP and other documents, and (3) requests the first trial payment.  (*Bushell, supra,* at p. 924.)  In the second stage, if the borrower has made all required trial payments and complied with all of the HAMP TPP's other terms, and if the borrower's representations remain correct, the lender *must* offer the borrower a

10

permanent loan modification.  (*Id.* at pp. 924-925; *West, supra,* at pp. 786, 788; *Wigod, supra,* at p. 557.)  If the lender does not do so, the borrower may sue the lender for breach of contract and related causes of action.  (*Bushell, supra,* at pp. 928-931.)

B.      *Standard of Review*

"A general demurrer searches the complaint for all defects going to the existence of a cause of action and places at issue the legal merits of the action on assumed facts." (*Carman v. Alvord* (1982) 31 Cal.3d 318, 324.)  On appeal from the sustaining of a demurrer without leave to amend, we must consider two issues: the sufficiency of the operative pleading and the plaintiff's ability to amend.

*1.      Sufficiency of the Pleading*

To assess the pleading's sufficiency, "we independently review the complaint to determine whether the facts alleged state a cause of action under any possible legal theory."  (*Berger v. California Ins. Guarantee Assn.* (2005) 128 Cal.App.4th 989, 998; see *Buller v. Sutter Health* (2008) 160 Cal.App.4th 981, 986.)  We will affirm "if proper on any grounds stated in the demurrer, whether or not the court acted on that ground." (*Carman v. Alvord, supra,* 31 Cal.3d at p. 324.)  On appeal, "the plaintiff bears the burden of demonstrating that the trial court erred" in sustaining the demurrer.  (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 879.)

"In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules.  'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law.' "  (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318; accord, *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.)  In addition to the complaint's allegations, we consider matters subject to judicial notice.  (*Blank v. Kirwan, supra*, at p. 318; *Schifando v. City of Los Angeles, supra*, at p. 1081; Code Civ. Proc., § 430.30.)  We also consider exhibits incorporated into a complaint.  (*Dodd v. Citizens Bank of Costa Mesa* (1990) 222 Cal.App.3d 1624, 1627; *108 Holdings, Ltd. v. City of Rohnert Park* (2006) 136

11

Cal.App.4th 186, 193.) "If facts appearing in the exhibits contradict those alleged [in the complaint], the facts in the exhibit take precedence." (*Holland v. Morse Diesel Internat., Inc.* (2001) 86 Cal.App.4th 1443, 1447, superseded by statute on other grounds as stated in *White v. Cridlebaugh* (2009) 178 Cal.App.4th 506, 521; see also *Dodd v. Citizens Bank of Costa Mesa, supra*, 222 Cal.App.3d at p. 1627 ["[F]acts appearing in exhibits attached to the complaint will also be accepted as true and, if contrary to the allegations in the pleading, will be given precedence"].)

In undertaking our independent review, "we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 318; see *Schifando v. City of Los Angeles, supra,* 31 Cal.4th at p. 1081.) "If the complaint states a cause of action under any theory, regardless of the title under which the factual basis for relief is stated, that aspect of the complaint is good against a demurrer." (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 38.)

### 2. *Leave to Amend*

"If the court sustained the demurrer without leave to amend, as here, we must decide whether there is a reasonable possibility the plaintiff could cure the defect with an amendment." (*Schifando v. City of Los Angeles, supra,* 31 Cal.4th at p. 1081.) "The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 318.)

"As a general rule, if there is a reasonable possibility the defect in the complaint could be cured by amendment, it is an abuse of discretion to sustain a demurrer without leave to amend." (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 446, 459.) "Nevertheless, where the nature of the plaintiff's claim is clear, and under substantive law no liability exists, a court should deny leave to amend because no amendment could change the result." (*Ibid*.)

12

*C.      Intentional and Negligent Misrepresentation*

"The elements of fraud are (1) misrepresentation, (2) knowledge of falsity, (3) intent to induce reliance on the misrepresentation, (4) justifiable reliance on the misrepresentation, and (5) resulting damages.  [Citation.]  Fraud allegations ' "involve a serious attack on character" ' and therefore are pleaded with specificity.  [Citation.] General and conclusory allegations are insufficient.  [Citation.]  The particularity requirement demands that a plaintiff plead facts which ' " 'show how, when, where, to whom, and by what means the representations were tendered.' " ' "  (*Cansino v. Bank of America* (2014) 224 Cal.App.4th 1462, 1469; see *Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1255; *Graham v. Bank of America, N.A.* (2014) 226 Cal.App.4th 594, 605-606.)  "A plaintiff's burden in asserting a fraud claim against a corporate employer is even greater.  In such a case, the plaintiff must 'allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written.' "  (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645 (*Lazar*).)

"[A] claim for negligent misrepresentation requires the plaintiff to prove each of the following:  '(1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage.' "  (*Public Employees' Retirement System v. Moody's Investors Service, Inc.* (2014) 226 Cal.App.4th 643, 661.)  " 'The tort of negligent misrepresentation, a species of the tort of deceit [citation], does not require intent to defraud but only the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true.' "  (*Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872, 892 (*Jolley*).)  Like fraud, negligent misrepresentation must be pleaded with particularity.  (*Charnay v. Cobert* (2006) 145 Cal.App.4th 179, 185, fn. 14.)

13

The complaint asserts causes of action for intentional misrepresentation and negligent misrepresentation based on four alleged misrepresentations. On appeal, Rossetta contends the trial court erred in considering each alleged misrepresentation individually. She correctly observes that a general demurrer may not be sustained as to a portion of a cause of action. (*Kong v. City of Hawaiian Gardens Redevelopment Agency* (2002) 108 Cal.App.4th 1028, 1047 ["a demurrer cannot rightfully be sustained to part of a cause of action"]; *PH II, Inc. v. Superior Court* (1995) 33 Cal.App.4th 1680, 1682 ["demurrer does not lie to a portion of a cause of action"].) She also observes that the appropriate procedural device for challenging a portion of a cause of action is a motion to strike (Code Civ. Proc., § 435), which CitiMortgage failed to file.

Applying the foregoing rule, we must determine whether the complaint states a cause of action for intentional or negligent misrepresentation based on any of the alleged misrepresentations. (See *Daniels v. Select Portfolio Servicing, Inc.* (2016) 246 Cal.App.4th 1150, 1167 (*Daniels*) ["the question for this court is whether appellants stated a claim for intentional or negligent misrepresentation based on *any* of the alleged misrepresentations"].) If any of the alleged misrepresentations supports a cause of action, we must reverse. In making this determination, however, we necessarily consider each alleged misrepresentation separately. We do not follow a gestalt approach to fraud-based causes of action, clumping all alleged misrepresentations into a single undifferentiated mass.[8] Rather, we examine each alleged misrepresentation in turn, reviewing the

_____

[8] Arguing by analogy to *Fleet v. Bank of America N.A.* (2014) 229 Cal.App.4th 1403 (*Fleet*) and *Chavez v. Indymac Mortgage* (2013) 219 Cal.App.4th 1052 (*Chavez*), Rossetta insists the complaint describes a scheme to defraud borrowers by unnecessarily prolonging the loan modification process, allowing lenders to charge increased fees and penalties, and plunging borrowers deeper and deeper into default. Although *Fleet* and *Chavez* describe similar schemes, neither relieves Rossetta of the obligation to plead every element of a cause of action for intentional or negligent misrepresentation— including the alleged misrepresentation—factually and specifically. (*Cadlo v. Owens-*

14

allegations as a whole to determine whether the complaint states facts sufficient to constitute a cause of action. (*State ex rel. Metz v. CCC Information Services, Inc.* (2007) 149 Cal.App.4th 402, 412.) With this framework in mind, we now consider the alleged misrepresentations.

### 1. *July 2010 Representations*

Rossetta alleges CitiMortgage misrepresented its ability to consider her for a loan modification on two occasions. First, she alleges a CitiMortgage representative named either Brian or Charlie Welch told either Rossetta or Roat in a July 2010 telephone conversation that "nothing could be done to assist [Rossetta] with a HAMP loan modification until she was three months delinquent and therefore in [d]efault." Second, Rossetta alleges CitiMortgage misrepresented in a July 2010 letter that she "could not qualify for a HAMP loan modification or other modification program because [her] default was not imminent." These representations were false, Rossetta says, because HAMP and other loan modification programs do not require a borrower to default to qualify for a loan modification.

The complaint alleges Rossetta relied on CitiMortgage's alleged misrepresentations in deciding to go into default on her mortgage. However, the complaint also alleges that Rossetta was *already* in default at the time the alleged misrepresentations were made. Specifically, the complaint alleges that Rossetta defaulted in June 2010, before the telephone conversation with Brian or Charlie Welch or CitiMortgage's letter. Reading the complaint as a whole, we conclude that Rossetta fails to allege reliance on the July 2010 misrepresentations or resulting damages.

---

*Illinois, Inc.* (2004) 125 Cal.App.4th 513, 519.) Rossetta's reliance on *Fleet* and *Chavez* is unavailing.

Rossetta struggles to avoid this conclusion by arguing the trial court ignored the purportedly "crucial" allegation that an unidentified person, presumably connected with CitiMortgage, made a similar misrepresentation some two months earlier. As noted, the complaint alleges Rossetta contacted CitiMortgage in May 2010 and "was told that [CitiMortgage] would be unable to assist her unless she was at least three months delinquent in her monthly mortgage payments, and thus in [d]efault." Although the complaint alleges the May 2010 statement was false, the complaint does not offer the statement as a basis for her intentional and negligent misrepresentation causes of action.[9]

Rossetta does not explain, and we cannot conceive, how the alleged misrepresentation in May 2010 establishes her reliance on the alleged misrepresentations in July 2010. Although not alleged in the complaint, we assume for the sake of argument that Rossetta relied on the May 2010 statement in deciding to default. Even so assuming, we perceive no way Rossetta could have relied on the July 2010 statements in deciding to default, *since she was already in default at the time the July 2010 statements were made.*[10] We therefore conclude, as the trial court did, that the complaint fails to allege reliance on the July 2010 statements or resulting damage. Having so concluded, we decline to reach the trial court's alternative ruling that Rossetta's causes of action for intentional and negligent misrepresentation are partially time-barred to the extent they are based on the July 2010 statements.

2.      *August 2010 Representations*

Next, the complaint alleges that Rossetta was deceived by means of a series of written and spoken misrepresentations in August 2010. First, the complaint alleges that

---

[9] Rossetta does not seek leave to amend the complaint to state a cause of action for intentional or negligent misrepresentation based on the May 2010 statement.

[10] The complaint does not allege—and Rossetta does not contend—that the alleged misrepresentations in July 2010 induced her to become more delinquent.

16

Rossetta received an "email" from CitiMortgage, "stating the specific terms of the permanent loan modification agreement" and indicating that "the loan modification documents were being sent." Second, the complaint alleges that Helen (last name unknown) misrepresented in a telephone conversation that Rossetta was approved for either a HAMP modification or a "trial plan modification," and "would be approved for a permanent loan medication [*sic*] upon completion of the trial modification plan payments/repayment plan payments." Third, the complaint alleges that Rossetta received a repayment plan, which she mistook for a HAMP TPP.[11] These representations were false, the complaint alleges, because CitiMortgage failed to grant Rossetta a permanent loan modification. Thus, Rossetta's fraud cause of action appears to be based on a theory of promissory fraud, "a subspecies of the action for fraud and deceit." (*Lazar, supra,* 12 Cal.4th at p. 638 ["A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud"].)

We perceive three overarching problems with Rossetta's allegations. First, they cannot support a cause of action for negligent misrepresentation. A representation is generally not actionable unless it concerns "past or existing facts." (*Neu-Visions Sports, Inc. v. Soren/McAdam/Bartells* (2000) 86 Cal.App.4th 303, 309, 310.) Although a false promise to perform in the future can support a cause of action for intentional misrepresentation, it does not support a cause of action for negligent misrepresentation. (*Tarmann v. State Farm Mut. Auto. Ins. Co.* (1991) 2 Cal.App.4th 153, 158, 159 ["Simply put, making a promise with an honest but unreasonable intent to perform is

_____

[11] The complaint does not specifically identify the repayment plan as an alleged misrepresentation. Nevertheless, Rossetta suggests she was deceived by the repayment plan, which she received instead of a HAMP TPP. We consider the possibility that the repayment plan constitutes an actionable misrepresentation as part of our obligation to liberally construe the pleadings.

17

wholly different from making one with no intent to perform and, therefore, does not constitute a false promise. . . . [W]e decline to establish a new type of actionable deceit: the negligent false promise"].) An alleged promise to grant a loan modification does not concern past or existing facts, and thus cannot be the basis for a negligent misrepresentation cause of action.

Second, any fraud cause of action based on the August 2010 statements appears to be time-barred. The statute of limitations for fraud is three years. (Code Civ. Proc., § 338, subd. (d).) Rossetta tries to avoid the statute of limitations by invoking the discovery rule. Specifically, she alleges she did not discover the alleged fraud until 2012, "when she began to uncover media articles . . . about the HAMP programs revealing a widespread practice among lending institutions and mortgage servicers of delaying the loan modification process and of wrongfully denying loan modifications." Although Rossetta may not have known the full extent of the alleged fraud until 2012, she knew that CitiMortgage did not intend to honor the alleged promise to grant her a permanent loan modification by January 3, 2011, when her application for a HAMP modification was denied. Thus, the complaint suggests that Rossetta was on notice of the facts constituting the alleged promissory fraud by January 3, 2011, more than three years before she filed suit. (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807 [the delayed discovery rule "only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action"]; *Mangini v. Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125, 1150 (*Mangini*) ["If a person becomes aware of facts which would make a reasonably prudent person suspicious, he or she has a duty to investigate further and is charged with knowledge of matters which would have been revealed by such an investigation"], superseded by statute on other grounds as stated in *Rufini, supra,* 227 Cal.App.4th at p. 311.)

Third, even assuming the allegations are timely, Rossetta fails to adequately allege a false promise. Rather than argue that any particular statement was false, Rossetta

18

appears to argue that all of the August 2010 statements, taken together, amount to a representation that, "she was approved for a HAMP TPP, and that upon completion of the TPP, she was also approved for a permanent loan modification." We reject this impressionistic approach to pleading fraud, and reiterate that every element of a cause of action for fraud must be alleged factually and specifically, including the alleged misrepresentations. (*Cadlo v. Owens-Illinois, Inc., supra,* 125 Cal.App.4th at p. 519.) As we shall discuss, none of the alleged misrepresentations in August 2010 amount to a false promise that Rossetta would receive a permanent loan modification.

         *a.*    *Exhibit B*

As noted, the complaint characterizes Exhibit B as "an email from [CitiMortgage] stating the specific terms of the permanent loan modification agreement." The complaint alleges that Exhibit B reflects a false promise to grant Rossetta a permanent loan modification. This theory runs aground on Exhibit B itself, which contains no such promise.

As the trial court observed, Exhibit B is a printout of a webpage, not an email. Exhibit B features a heading entitled, "Your Mortgage Modification." Under the heading, Exhibit B states, "View the terms of your modification which will make your payments more affordable. Check your status often to ensure that your paperwork has been accepted and find new requests for additional documentation." Exhibit B then displays a heading entitled, "Modification Status." Under the heading, Exhibit B states: "07/30/2010  Alert!  Your mortgage modification document has been sent. Review, sign and return as instructed." Exhibit B then displays a heading entitled, "Modification Details." Under the heading, Exhibit B displays a chart setting forth current and proposed loan terms, followed by the notation, "The sample chart above is based on an interest rate reduction or a principal reduction. Total monthly payments are based on an estimated mortgage balance including interest, taxes and insurance. The final modification may vary depending on the review and verification of the financial

19

information you have provided and other restrictions.  A mortgage modification may be reported to credit reporting agencies."  Exhibit B then displays a final heading, entitled "Document Summary."  Under the heading, Exhibit B displays a link, entitled "View the status of pending documentation."  Contrary to the complaint, Exhibit B cannot reasonably be characterized as a representation that Rossetta would be offered a HAMP TPP, much less a permanent loan modification.  Although Exhibit B refers to "proposed" loan terms, the document does not say anything about a HAMP TPP (or any other trial period plan), and does not represent that Rossetta will receive a permanent loan modification with those or any other terms.  If anything, by instructing the borrower to "Check your status often" and warning that, the "final modification may vary," Exhibit B makes clear that the loan modification application process is not complete.  No reasonable borrower would interpret Exhibit B as a representation that she would receive a HAMP TPP or other trial period plan, let alone a permanent loan modification.

In apparent recognition of the foregoing, Rossetta argues the alleged misrepresentation was contained in another document, an actual email, which she failed to attach to her pleading.  She notes that she was not required to attach the purported email to the complaint, adding, "The allegation of the existence of the email by itself should have been enough, as this was not a summary judgment motion."

Rossetta's argument runs counter to what she told the trial court.  During the trial court proceedings, Rossetta consistently identified Exhibit B as "an email" reflecting an alleged misrepresentation.  What matters, for our purposes, is not the characterization of Exhibit B as an email, but the designation of Exhibit B as an alleged misrepresentation.  The complaint clearly identifies Exhibit B as an alleged misrepresentation.  Consequently, we focus on whether Exhibit B contains an actionable misstatement.  As we have already established, it does not.

20

### b. *Helen's Remarks*

Next, the complaint alleges that Helen misrepresented that Rossetta was approved for either a HAMP modification or a "trial plan modification," and "would be approved for a permanent loan medication [*sic*] upon completion of the trial modification plan payments/repayment plan payments." We perceive two glaring problems with these allegations.

First, Rossetta fails to adequately allege what Helen actually said. As previously discussed, a HAMP modification is a particular type of loan modification, governed by uniform rules set forth in Supplemental Directive 09-01, and other guidelines and procedures promulgated by the Department of the Treasury. (*West, supra,* 214 Cal.App.4th at p. 787.) A HAMP TPP is an enforceable contract, giving the borrower a right to sue for breach of contract if the lender fails to grant a permanent loan modification. (*Bushell, supra,* 220 Cal.App.4th at p. 928.) By contrast, a non-HAMP trial period plan may or may not obligate the lender to grant a permanent loan modification, depending on the terms of the parties' agreement. (See, e.g., *Morgan v. Aurora Loan Services, LLC* (C.D. Cal. Oct. 7, 2013, No. CV 12-4350-CAS (MRWx)) 2013 U.S. Dist. LEXIS 145623, *10 [distinguishing non-HAMP agreements from HAMP TPPs, and noting that non-HAMP agreements "expressly disclaimed any promise of a permanent modification"].) Likewise, a repayment plan may or may not entitle the borrower to a permanent loan modification, depending on the terms of the plan. Here, of course, we have been provided with a copy of the repayment plan, which says nothing about a permanent loan modification.

Recognizing the significant differences between various types of mortgage relief, the trial court, in sustaining the demurrer to the first amended complaint, expressed "its expectation that plaintiff clearly set forth the context of each representation and agreement in any further pleading, or risk suffering the conclusion that further amendment would be pointless." Rossetta failed to comply with the trial court's

21

instruction. If anything, the new allegations are even more opaque, conflating "HAMP loan modifications" and "trial plan modifications," and "trial modification plan payments" and "repayment plan payments." These nebulous allegations do not plead an alleged misrepresentation with the required specificity.

Second, to the extent Rossetta claims to have relied on Helen's representations as a promise that she would eventually obtain a permanent loan modification from CitiMortgage, she fails to plead with particularity that Helen had the authority to commit CitiMortgage to granting such a loan modification. The complaint alleges that Helen was an "employee/representative/agent" of CitiMortgage, but offers no allegations concerning her authority to make binding promises or any facts indicating it would be reasonable to rely on Helen's statements as creating a binding promise to eventually provide a permanent loan modification, especially in light of Helen's refusal to give her last name. Therefore, with respect to Helen's statements, Rossetta fails to satisfy the pleading requirements for alleging a fraud cause of action against a corporate defendant. (*Lazar, supra,* 12 Cal.4th at p. 645.)

### c. Repayment Plan

Following her conversation with Helen, Rossetta received a letter from CitiMortgage stating, in part: "Your request for a repayment plan has been approved." The letter attaches an agreement contemplating three monthly payments of $1,209 for September, October and November 2010. Rossetta agreed to the terms of the repayment plan on August 15, 2010. Neither the letter nor accompanying agreement makes any mention of HAMP or any other loan modification program, and Rossetta does not argue that the repayment plan can or should be construed as a HAMP TPP or other trial period plan. Nevertheless, Rossetta argues she believed she would receive a permanent loan modification upon completion of the repayment plan.

Contrary to Rossetta's apparent belief, her confusion surrounding the significance of the repayment plan cannot transform Exhibit B into a promise to grant a permanent

22

loan modification. Furthermore, though Rossetta's confusion may explain her inability to specify what Helen said, it does nothing to cure that pleading failure. We therefore conclude, as the trial court did, that Rossetta cannot premise a cause of action for intentional misinterpretation on the August 2010 statements. Having so concluded, we decline to consider the alternative ruling that the complaint fails to allege resulting damages because Rossetta's income was unstable.

### 3. *April 2012 Representations*

Finally, the complaint alleges that Sincox made two false promises to Rossetta in April 2012. First, the complaint alleges that Sincox misrepresented that Rossetta had been approved for another trial loan modification, which she would receive as soon as CitiMortgage received an application and other documents from her.[12] Second, the complaint alleges that Sincox misrepresented that, "upon successful completion of the trial plan payments, she would receive a permanent loan modification with a 2% interest rate fixed for [five] years . . . [and] a principal reduction."

With respect to both allegations, the complaint alleges that Rossetta understood Sincox to mean she would be receiving a HAMP TPP, as she was under consideration for a HAMP modification at the time. The complaint further alleges, "Sincox indicated that the loan modification documentation would not be provided in advance, but rather, would come after the trial payment period." The complaint does not specify which "loan modification documentation" would not be provided in advance, however, we understand the allegation to refer to a permanent loan modification agreement, as such an agreement would naturally follow the successful completion of a HAMP TPP. The complaint alleges that Rossetta submitted another loan modification application and related

---

[12] Rossetta does not allege that she had not been approved for another trial loan modification.

23

documents, but did not receive a HAMP TPP or other trial period plan. The complaint does not allege that Rossetta made any trial period payments.

We agree with the trial court that the second alleged misrepresentation (that Rossetta would receive a permanent loan modification upon successful completion of the trial plan agreement) fails to state facts sufficient to constitute a cause of action, as Rossetta fails to allege reliance. Rossetta does not challenge this conclusion. Instead, she focuses on the first alleged misrepresentation (that Rossetta would receive a trial period plan upon receipt of her application and related documents), which the trial court appears to have overlooked.[13] Exercising our independent judgment, and reading the complaint liberally, as we must, we perceive a reasonable possibility that Rossetta could amend the complaint to state a cause of action for intentional misrepresentation based on the alleged false promise to provide her with a HAMP TPP. We perceive no possibility that Rossetta could amend the complaint to state a cause of action for negligent misrepresentation based on the alleged false promise, since, as discussed, a false promise to perform in the future cannot support a cause of action for negligent misrepresentation. (*Tarmann v. State Farm Mut. Auto. Ins. Co., supra,* 2 Cal.App.4th at pp. 158-159.)

Reading the complaint as a whole, Rossetta adequately alleges that Sincox promised to provide her with a HAMP TPP as soon as she submitted an updated loan modification application and supporting documents.[14] The complaint also adequately

---

[13] The oversight was understandable. The complaint specifically identifies the second alleged misrepresentation as the basis for the intentional misrepresentation cause of action. Although the complaint alleges that Sincox misrepresented that Rossetta would receive a HAMP TPP, that allegation does not appear in the "Intentional Misrepresentation" section of the complaint.

[14] Although we have some difficulty believing a lender would make an unconditional offer of a HAMP TPP to a distressed borrower prior to receiving a current loan modification application, we accept the allegation as true, as we must.

24

alleges that Sincox made the promise without any intention of performing it, with the intent to induce Rossetta to submit another application, thereby prolonging the loan modification process and allowing CitiMortgage to charge additional interest, fees, and penalties. The complaint founders, however, on the element of damages.

The complaint alleges Rossetta was injured in maintaining her delinquent status, forbearing from pursuing other options to save her home, and spending "over two years attempting to obtain a loan modification while her arrearages, late fees and penalties continued to accumulate." Elsewhere, the complaint alleges Rossetta suffered injury to her credit and unspecified harm as a result of granting CitiMortgage access to her personal financial information.[15] However, the complaint fails to allege facts demonstrating that any of these damages were the result of her reliance on the alleged misrepresentation by Sincox. For example, the complaint alleges Rossetta might have pursued unspecified "alternate remedies" had she not relied on the false promise that she would receive a HAMP TPP. Not only does Rossetta fail to identify any of these "alternate remedies," she also fails to allege they were available to her in April 2012 and would have helped to avoid the damage she allegedly suffered as a result of the misrepresentation. If anything, the complaint suggests Rossetta had no alternative remedies. According to the complaint, "The only avenue for [Rossetta] to remain in her permanent residence since 2001, through two [b]reast [c]ancer battles, was for [CitiMortgage] to fulfill its promises to modify the loan, thus lifting the hardship in a manner only [CitiMortgage] had the power to do, but failed to do so." Thus, the

---

[15] The complaint also identifies Rossetta's attorneys' fees in this action as damages. Rossetta's attorneys' fees are not recoverable as damages. (*Khajavi v. Feather River Anesthesia Medical Group* (2000) 84 Cal.App.4th 32, 62 [" 'In the absence of a statute authorizing attorneys' fees as an element of damages, or of a contract to pay such fees in event of the party's recovery, attorneys' fees paid by a successful party in an action are never recoverable against the unsuccessful party' "].)

25

complaint expressly disclaims the possibility that Rossetta could have pursued other options.

Similarly, though Rossetta alleges she suffered damage to her credit and incurred increased arrears, fees and penalties during the period in which she fruitlessly pursued a loan modification, she fails to explain why these damages were the result of any false promise by Sincox, rather than her own default. In this regard, we note that Rossetta could not have spent two years pursuing a loan modification in reliance on a false promise by Sincox, as the promise was not even made until April 2012, some twenty-two months after her default. Furthermore, even assuming arguendo that she incurred such amounts in reliance on the alleged false promise, Rossetta fails to allege that she actually paid them.

Finally, Rossetta alleges she spent time and energy on the loan modification process. In *Bushell,* another panel of this court concluded that time spent "repeatedly" responding to a lender's requests could constitute a cognizable theory of damages, when combined with other things, like "discontinuing efforts to pursue a refinance from other financial institutions or to pursue other means of avoiding foreclosure (such as bankruptcy restructuring, or selling or renting [the borrower's] home); by having their credit reports further damaged; and by losing their home and making it unlikely they could purchase another one." (*Bushell, supra,* 220 Cal.App.4th at p. 928.) By contrast, in *Lueras v. BAC Home Loans Servicing, LP* (2013) 221 Cal.App.4th 49 (*Lueras*), the court concluded that, "Time and effort spent assembling materials for an application to modify a loan is the sort of nominal damage subject to the maxim *de minimis non curat lex*—i.e., the law does not concern itself with trifles." (*Id.* at p. 79.) The damages alleged in connection with the alleged false promise in April 2012 are more akin to those in *Lueras.* Even liberally construed, the complaint fails to allege that Rossetta sustained more than nominal damage as a result of the time and effort she spent submitting a loan

26

modification application to CitiMortgage in reliance on the alleged false promise in April 2012. We therefore conclude the complaint fails to allege resulting damages.

Not surprisingly, given the trial court's failure to consider the alleged false promise to provide a HAMP TPP, Rossetta does not address the pleading failures discussed above or suggest additional facts that might be alleged to overcome them. Because she has not had an opportunity to address these issues, and because we see a reasonable possibility Rossetta can amend to state a viable cause of action for intentional misrepresentation based on the alleged false promise in April 2012, we conclude the trial court erred in sustaining the demurrer without leave to amend. (See *City of Stockton v. Superior Court* (2007) 42 Cal.4th 730, 747 [as a matter of fairness, a plaintiff who has not had an opportunity to amend her complaint in response to a demurrer should be allowed leave to amend unless the complaint shows on its face it is incapable of amendment].) We therefore reverse to give Rossetta an opportunity to amend to allege she suffered damages as a result of her reliance on an alleged false promise by Sincox to provide her with a HAMP TPP in April 2012.

D.      *Breach of Contract*

"A cause of action for damages for breach of contract is comprised of the following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1388.) The complaint alleges that CitiMortgage breached two contracts: a written contract and an oral one. As we shall discuss, Rossetta fails to state a cause of action under either theory.

1.      *Written Contract*

The complaint alleges CitiMortgage and Rossetta entered into a written contract under which CitiMortgage agreed to grant Rossetta "a permanent loan modification with the terms identified in Exhibit [B]" upon completion of "the 2010 trial/repayment plan."

27

The complaint further alleges Rossetta performed the agreement "by making all of the trial/repayment plan payments of the written contract," and CitiMortgage breached the agreement by failing to grant Rossetta a permanent loan modification with the terms stated in Exhibit B. The trial court rejected these allegations, ruling that the complaint fails to adequately allege the existence of a written contract. We agree with the trial court.

On appeal, Rossetta argues that Exhibit B and the repayment plan together constitute a trial plan agreement. We are not persuaded. As previously discussed, neither document says anything about a HAMP TPP or other trial period plan. Although Exhibit B contemplates the possibility of a permanent loan modification, nothing in Exhibit B suggests Rossetta would be entitled to a permanent loan modification upon the happening of any particular condition. Similarly, though the repayment plan contemplates that Rossetta would make three monthly payments, nothing in the repayment plan suggests she would be entitled to a permanent loan modification upon completion of the plan. Thus, neither document can reasonably be construed as an agreement to grant Rossetta a permanent loan modification upon the completion of the repayment plan.

Rossetta argues she believed the repayment plan constituted a HAMP TPP, because the monthly payments were roughly the same as the "proposed" payments in Exhibit B, and her total payments pursuant to the plan were approximately half of her accumulated arrears. However, as previously suggested, Rossetta's unfounded belief cannot transform the repayment plan into HAMP TPP. "Contract formation requires mutual consent, which cannot exist unless the parties 'agree upon the same thing in the same sense.' [Citations.] . . . 'Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts.' " (*Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 208.) Here, nothing in Exhibit B or the repayment plan suggests that CitiMortgage and Rossetta mutually agreed to enter into a trial period plan whereby CitiMortgage

28

would offer Rossetta a permanent loan modification upon completion of the repayment plan. The trial court correctly concluded that Rossetta failed to allege the existence of a written contract.

### 2. *Oral Contract*

Next, the complaint alleges that Rossetta and CitiMortgage entered into an oral agreement under which Rossetta "would receive a trial plan modification and upon completion would receive a permanent loan modification with 2% interest fixed for five years, which would then increase by 1% a year thereafter but would be no greater than the current market rate." The complaint alleges Rossetta performed the oral agreement by sending CitiMortgage documents, and CitiMortgage breached the oral agreement "by failing to send [Rossetta] the trial plan or permanent loan modification agreement with the terms represented by Sincox." The trial court rejected these allegations on the grounds that, "The alleged oral contract has no terms for a TPP, the condition predicate to modification."

Rossetta does not challenge, and we do not reach, the trial court's conclusion that the complaint fails to adequately allege an oral TPP or other trial plan agreement. Instead, she argues the trial court examined the wrong oral contract. According to Rossetta, the relevant contract was not a TPP, but an oral agreement to provide a TPP. The trial court overlooked this theory, which is only obliquely alleged in the complaint.

Exercising our independent judgment, we conclude that Rossetta's newly developed theory does not save her breach of contract cause of action, as an agreement to provide a TPP on terms to be specified in the future amounts to an unenforceable "agreement to agree." (*Bustamante v. Intuit, Inc., supra,* 141 Cal.App.4th at pp. 213, 213-214 [" 'Preliminary negotiations or [agreements] for future negotiations are not the functional equivalent of a valid, subsisting agreement' "]; see also *Daniels, supra,* 246 Cal.App.4th at p. 1176 [alleged oral agreement in which lender agreed to grant borrower a loan modification and borrower agreed to submit documents and make monthly

29

payments of $1000 was unenforceable "agreement to agree"].)  We therefore conclude the trial court properly sustained the demurrer to the breach of contract cause of action.

As noted, the trial court overlooked the allegation that CitiMortgage breached an oral agreement to provide Rossetta with a TPP.  Consequently, Rossetta has not had an opportunity to address this issue.  Nevertheless, we see no reasonable possibility that Rossetta could amend the complaint to allege an enforceable agreement to provide a TPP.  We therefore conclude the trial court properly sustained the demurrer to the cause of action for breach of contract without leave to amend.

E.      *Promissory Estoppel*

Promissory estoppel requires:  (1) a promise that is clear and unambiguous in its terms, (2) reliance by the party to whom the promise is made, (3) the reliance must be reasonable and foreseeable, and (4) the party asserting the estoppel must be injured by his or her reliance.  (*Aceves v. U.S. Bank N.A.* (2011) 192 Cal.App.4th 218, 225.)  Rossetta premises her promissory estoppel cause of action on two alleged promises:  (1) an alleged promise in 2010 to grant her a loan modification with the terms set forth in Exhibit B, and (2) an alleged oral promise in 2012 to grant her a trial plan and permanent loan modification.  Neither alleged promise supports a cause of action for promissory estoppel.

As we have discussed, neither Exhibit B nor the repayment plan can be construed as a promise to grant Rossetta a permanent loan modification.  Rossetta does not suggest any other factual basis for an alleged promise to grant her a permanent loan modification in 2010.  We therefore conclude that Rossetta's first promissory estoppel theory fails for lack of a clear and unambiguous promise.

Rossetta's second theory does not fare much better.  Rossetta alleges Sincox promised to send a trial period plan or a HAMP TPP.  However, a general promise to send some sort of trial loan modification agreement does not constitute a clear and unambiguous promise to provide any kind of mortgage relief.  Furthermore, to the extent

30

Rossetta alleges a promise to send a trial loan modification agreement on any terms, she fails to allege reasonable reliance on such a promise. (Cf. *Daniels, supra,* 246 Cal.App.4th at p. 1179 [no borrower could reasonably rely on an alleged promise to offer a loan modification on any terms, as the offered modification might not lower their monthly payments sufficiently to allow her to avoid default].) To the extent Rossetta alleges a promise to provide a permanent loan modification, she fails to allege actual reliance, as she does not allege she made any trial plan payments. We therefore conclude the complaint fails to state a cause of action for promissory estoppel.

The trial court properly sustained the demurrer to the cause of action for promissory estoppel. Nevertheless, the trial court does not appear to have considered the alleged promise to send Rossetta a HAMP TPP. We reverse to give Rossetta an opportunity to amend to state a viable cause of action based on the alleged oral promise in April 2012, if she can.

## F.    *Negligence*

Next, the complaint alleges CitiMortgage negligently mishandled Rossetta's loan modification applications. The elements of a cause of action for negligence are (1) the existence of a duty to exercise due care, (2) breach of that duty, (3) causation, and (4) damages. (See *Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 500.) Whether a duty of care exists is a question of law to be decided on a case-by-case basis. (*Lueras, supra,* 221 Cal.App.4th at p. 62.)

As a "general rule," lenders do not owe borrowers a duty of care unless their involvement in a transaction goes beyond their "conventional role as a mere lender of money." (*Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089, 1096 (*Nymark*).) "Even when the lender is acting as a conventional lender," however, "the no-duty rule is only a general rule." (*Jolley, supra,* 213 Cal.App.4th at p. 901.) Thus, " '*Nymark* does not support the sweeping conclusion that a lender never owes a duty of care to a borrower.' " (*Ibid.*)

31

In order to determine whether a duty of care exists, courts balance the *Biakanja*[16] factors, "among which are [(1)] the extent to which the transaction was intended to affect the plaintiff, [(2)] the foreseeability of harm to him, [(3)] the degree of certainty that the plaintiff suffered injury, [(4)] the closeness of the connection between the defendant's conduct and the injury suffered, [(5)] the moral blame attached to the defendant's conduct, and [(6)] the policy of preventing future harm." (*Nymark, supra,* 231 Cal.App.3d at p. 1098, citing *Biakanja, supra,* 49 Cal.2d at p. 650.)

California courts of appeal have not settled on a uniform application of the *Biakanja* factors in cases that involve a loan modification. Although lenders have no duty to offer or approve a loan modification (*Lueras, supra,* 221 Cal.App.4th at p. 68; *Jolley, supra,* 213 Cal.App.4th at p. 903), courts are divided on the question of whether accepting documents for a loan modification is within the scope of a lender's conventional role as a mere lender of money, or whether, and under what circumstances, it can give rise to a duty of care with respect to the processing of the loan modification application. (Compare *Lueras, supra,* 221 Cal.App.4th at p. 67 [residential loan modification is a traditional lending activity, which does not give rise to a duty of care] with *Alvarez v. BAC Home Loans Servicing, L.P.* (2014) 228 Cal.App.4th 941, 948 (*Alvarez*) [servicer has no general duty to offer a loan modification, but a duty may arise when the servicer agrees to consider the borrower's loan modification application], *Daniels, supra,* 246 Cal.App.4th at pp. 1180-1183 [following *Alvarez* and applying *Biajanka* factors to conclude that lender owed borrowers a duty of care in the loan modification process] and *Jolley, supra,* at p. 906 [commercial lending creates a special relationship, thereby creating a duty of care].) Federal district courts in California have also reached different results. (Compare, e.g., *Marques v. Wells Fargo Bank, N.A.* (N.D.

---

[16] *Biakanja v. Irving* (1958) 49 Cal.2d 647 (*Biakanja*)

Cal. Oct. 13, 2016, No. 16-cv-03973-YGR) 2016 U.S. Dist. LEXIS 142193, *19 [servicers do not owe borrowers a duty of care in processing loan modification applications], *Garcia v. PNC Mortgage* (N.D. Cal. Sept. 16, 2015, No. 14-cv-3543-PJH) 2015 U.S. Dist. LEXIS 123920, *9 ["a servicer, as any financial institution, owes no duty of care to a borrower in the provision of ordinary financial services such as loan modifications"], *Hernandez v. Select Portfolio, Inc.* (C.D. Cal. June 25, 2015, No. CV 15-01896 MMM (AJWx)) 2015 U.S. Dist. LEXIS 82922, *56 ["a lender that agrees to consider a borrower's loan modification application does not act outside its conventional role as a money lender and does not owe a duty of care"]) with *Segura v. Wells Fargo Bank, N.A.* (C.D. Cal. Sept. 26, 2014, No. CV-14-04195-MWF (AJWx)) 2014 U.S. Dist. LEXIS 143038, *32-33[a duty of care exists once the lender offers a borrower the opportunity to apply for a loan modification], *Penermon v. Wells Fargo Home Mortgage* (N.D. Cal. Aug. 28, 2014, No. 14-cv-00065-KAW) 2014 U.S. Dist. LEXIS 121207, *13-14 ["once [defendant] provided Plaintiff with the loan modification application and asked her to submit supporting documentation, it owed her a duty to process the completed application once it was submitted"), and *Johnson v. PNC Mortgage* (N.D. Cal. 2015) 80 F.Supp.3d 980, 985-986 ["Once PNC offered the Johnsons an opportunity to modify their loan, it owed them a duty to handle their application with ordinary care"].) Although the Ninth Circuit has signaled that it may view the "no duty" line of cases as more persuasive (see, e.g., *Anderson v. Deutsche Bank Nat'l Trust Co. Ams.* (9th Cir. 2016) 649 Fed. Appx. 550, 552 [loan servicer has no common law duty to approve application within a particular time frame]), the federal appellate court has declined to certify the question to our Supreme Court, which has yet to speak to the issue. (*Id.* at p. 552, fn. 1.)

The trial court relied on *Lueras* to hold that "lenders do not have a common law duty of care . . . to offer, consider, or approve a loan modification, to offer foreclosure alternatives, or to handle loans so as to prevent foreclosure." In *Lueras,* the plaintiff borrower alleged the defendant lender breached its duty of care by " 'failing to timely and

33

accurately respond to customer requests and inquiries,' by 'failing to comply with state consumer protection laws, properly service the loan, and use consistent methods to determine modification approvals,' " among other things. (*Lueras, supra,* 221 Cal.App.4th at p. 63.) The Court of Appeal for the Fourth District, Division Three, concluded that lenders do not owe a duty of care in considering or approving loan modification applications, reasoning that "a loan modification is the renegotiation of loan terms, which falls squarely within the scope of a lending institution's conventional role as a lender of money." (*Id.* at p. 67.)

Applying the *Biakanja* factors, the court explained: "If the modification was necessary due to the borrower's inability to repay the loan, the borrower's harm, suffered from denial of a loan modification, would not be closely connected to the lender's conduct. If the lender did not place the borrower in a position creating a need for a loan modification, then no moral blame would be attached to the lender's conduct." (*Lueras, supra,* 221 Cal.App.4th at p. 67.) Accordingly, the court concluded the *Biakanja* factors weighed against the imposition of a common law duty of care. (*Ibid.*) However, the court recognized that "a lender does owe a duty to a borrower to not make material misrepresentations about the status of an application for a loan modification or about the date, time, or status of a foreclosure sale." (*Id.* at p. 68.)

Rossetta contends the trial court erred in relying on *Lueras*, claiming that *Alvarez* is the better reasoned decision. In *Alvarez*, the plaintiffs alleged the lender breached its duty of care by failing to review their loan modification applications in a timely manner, foreclosing on their properties while they were under consideration for a HAMP modification, misplacing their applications, and mishandling them by relying on incorrect salary information. (*Alvarez, supra,* 228 Cal.App.4th at p. 945.) The Court of Appeal for the First District, Division Three, acknowledged the general rule, but observed that, " ' "*Nymark* and the cases cited therein do not purport to state a legal principle that a lender can never be held liable for negligence in its handling of a loan transaction within

34

its conventional role as a lender of money." ' " (*Id.* at p. 946, citing *Jolley, supra,* 213 Cal.App.4th at p. 902.)

Applying the *Biakanja* factors, the court found: "The transaction was intended to affect the plaintiffs and it was entirely foreseeable that failing to timely and carefully process the loan modification applications could result in significant harm to the applicants." (*Alvarez, supra,* 228 Cal.App.4th at p. 948.) With regard to the connection between the defendant's conduct and the injury suffered, the court found: " 'Although there was no guarantee the modification would be granted had the loan been properly processed, the mishandling of the documents deprived [the plaintiffs] of the possibility of obtaining the requested relief.' " (*Id.* at p. 949.) With respect to blameworthiness, the court found: "The borrower's lack of bargaining power, coupled with conflicts of interest that exist in the modern loan servicing industry, provide a moral imperative that those with the controlling hand be required to exercise reasonable care in their dealings with borrowers seeking a loan modification." (*Ibid.*) Finally, the court found that the policy of preventing future harm strongly favored the imposition of a duty of care after the California Homeowner Bill of Rights was effectuated on January 1, 2013. (*Id.* at p. 950.) Accordingly, the court concluded that when a lender agrees to consider a borrower's application for a loan modification, the *Biakanja* factors weigh in favor of imposing a duty of care. (*Id.* at p. 948.)

Pending guidance from our Supreme Court, we are persuaded by the reasoning in *Alvarez.* We find support for our conclusion in *Meixner v. Wells Fargo Bank, N.A.* (E.D. Cal. 2015) 101 F.Supp.3d 938, in which the federal district court, addressing the split in authority, observed: "*Alvarez* identified an important distinction not addressed by the *Lueras* reasoning—that the relationship differs between the lender and borrower at the time the borrower first obtained a loan versus the time the loan is modified. The parties are no longer in an arm's length transaction and thus should not be treated as such. While a loan modification is traditional lending, the parties are now in an established

35

relationship. This relationship vastly differs from the one which exists when a borrower is seeking a loan from a lender because the borrower may seek a different lender if he does not like the terms of the loan." (*Id.* at p. 954.)

Based on the foregoing, we are convinced that a borrower and lender enter into a new phase of their relationship when they voluntarily undertake to renegotiate a loan, one in which the lender usually has greater bargaining power and fewer incentives to exercise care. (See *Alvarez, supra,* 228 Cal.App.4th at p. 949 [during loan modification negotiations, " 'borrowers are captive, with no choice of servicer, little information, and virtually no bargaining power . . . [while] servicers may actually have positive incentives to misinform and under-inform borrowers' "].) We do not hold that a duty of care arises merely because a lender receives or considers a loan modification application. Nor do we hold, as the concurring opinion suggests, that a duty of care may arise solely by virtue of the parties' changing relationship. Rather, we conclude that the change in the parties' relationship can and should be factored into our application of the *Biakanja* factors. To this end, we find it significant that CitiMortgage allegedly refused to consider Rossetta's loan modification application until she was three months behind in her mortgage payments. By making default a condition of being considered for a loan modification, CitiMortgage did more than simply enhance its already overwhelming bargaining power; it arguably directed Rossetta's behavior in a way that potentially exceeds the role of a conventional lender. (See, e.g., *Gerbery v. Wells Fargo Bank, N.A.* (S.D. Cal. July 31, 2013, No. 13-CV-614-MMA (DHB)) 2013 U.S. Dist. LEXIS 107744, *32-33.) At a minimum, the alleged policy of making default a condition of being considered for a loan modification informs our application of the *Biakanja* factors (see *Ko v. Bank of America, N.A.* (C.D. Cal. Oct. 19, 2015, No. SACV 15-00770-CJC (DFMx)) 2015 U.S. Dist. LEXIS 142040, *28-99 (*Ko*)), to which we now turn.

With respect to the first factor, the loan modification transaction was plainly intended to affect Rossetta. CitiMortgage's decision on her application for a

36

modification plan would likely determine whether or not Rossetta could keep her house. (*Alvarez, supra,* 228 Cal.App.4th at p. 948; *Daniels, supra,* 246 Cal.App.4th at p. 1182.) We conclude the first *Biakanja* factor weighs in favor of finding a duty of care.

With respect to the second factor, the potential harm to Rossetta was readily foreseeable. " 'Although there was no guarantee the modification would be granted had the loan been properly processed, the mishandling of the documents deprived Plaintiff of the possibility of obtaining the requested relief.' " (*Alvarez, supra,* 228 Cal.App.4th at p. 948, citing *Garcia v. Ocwen Loan Servicing, LLC* (N.D. Cal. May 10, 2010, No. C 10-0290 PVT) 2010 U.S. Dist. LEXIS 45375, *9.) Furthermore, by making default a condition of being considered for a loan modification, CitiMortgage increased the likelihood that Rossetta would incur additional expenses of default during the lengthy loan modification process, thereby increasing the foreseeable potential harm. (*Ko, supra,* 2015 U.S. Dist. LEXIS 142040, *29-30 ["By creating an inducement for plaintiffs to default (and incur associated fees and interest payments) for there to be even a possibility of a modification, [the lender] has increased the foreseeability that a borrower would be harmed by the additional expenses of default incurred during a negligent implementation of the modification"].) We conclude the second *Biakanja* factor weighs in favor of finding a duty of care.

With respect to the third factor, Rossetta alleges she suffered injury in the form of damage to her credit, increased interest and arrears, and foregone opportunities to pursue unspecified other remedies. These allegations adequately establish injury at this stage of the proceedings. (See *Daniels, supra,* 246 Cal.App.4th at p. 1182.) We conclude the third *Biakanja* factor weighs in favor of finding a duty of care.

We have difficulty evaluating the fourth factor—the closeness of the connection between CitiMortgage's conduct and Rossetta's injuries—on the pleadings. On the one hand, the complaint alleges Rossetta's default was "imminent," suggesting she would have suffered damage to her credit and increased interest and arrears regardless of

37

CitiMortgage's conduct.  On the other hand, the complaint alleges Rossetta was current on her mortgage payments through May 2010, when she learned she could not be considered for a loan modification unless she defaulted.  We do not know when Rossetta would have defaulted if left to her own devices, and "it is very likely that a borrower induced to default before it becomes absolutely necessary suffers associated injuries involving increased fees and an increased possibility of losing the home."  (*Ko, supra,* 2015 U.S. Dist. LEXIS 142040, \*30.)  Construing the complaint liberally, as we must, we conclude the fourth *Biakanja* factor weighs in favor of finding a duty of care.

With respect to the fifth factor, we agree with the *Alvarez* court's analysis.  Although the court was unable to assess the lender's blameworthiness on the pleadings, the court nevertheless found it "highly relevant" that the borrowers' " 'ability to protect [their] own interests in the loan modification process [was] practically nil' " and the bank held " 'all the cards.' "  (*Alvarez, supra,* 228 Cal.App.4th at p. 949.)  There, as here, the borrowers were " 'captive, with no choice of servicer, little information, and virtually no bargaining power.' "  (*Ibid.*)  Following *Alvarez*, we conclude the borrower's lack of bargaining power, coupled with the lender's alleged incentive to unnecessarily prolong the loan modification process, "provide a moral imperative that those with the controlling hand be required to exercise reasonable care in their dealings with borrowers seeking a loan modification."  (*Ibid.*)  Additionally, we note that "the moral blame attached to the defendant's conduct . . . is heightened when the defendant first induces a borrower to take a vulnerable position by defaulting and then subjects the borrower's loan application to a review process that does not meet the standard of ordinary care."  (*Ko, supra,* 2015 U.S. Dist. LEXIS 142040, \*30.)  Accordingly, we conclude the fifth *Biakanja* factor weighs in favor of finding a duty of care.

Finally, with respect to the sixth factor, the legislature has enacted the California Homeowner Bill of Rights, which "demonstrates 'a rising trend to require lenders to deal reasonably with borrowers in default to try to effectuate a workable loan modification' "

38

and " 'expressed a strong preference for fostering more cooperative relations between lenders and borrowers who are at risk of foreclosure, so that homes will not be lost.' " (*Alvarez, supra,* 228 Cal.App.4th at p. 950; see also Civ. Code, § 2923.6 [encouraging lenders to offer loan modifications to borrowers in appropriate circumstances].) Imposing a duty of care in the particular circumstances of this case would serve the policies underlying these legislative preferences, and prevent future harm to borrowers, by giving lenders an incentive to handle loan modification applications in a timely and responsible manner. (*Alvarez, supra,* at p. 950.) We conclude the sixth *Biakanja* factor weighs in favor of finding a duty of care.

The complaint alleges CitiMortgage acted unreasonably by dragging Rossetta through a seemingly endless application process, requiring her to submit the same documents over and over again (including a "nonexistent" statement of permanent disability income), losing or mishandling documents, misstating the status of various applications, and ultimately denying them for bogus reasons. Having carefully weighed the *Biajanka* factors, we conclude these allegations adequately allege a cause of action for negligence that is sufficient to survive demurrer.

Relying on Civil Code section 2923.6, subdivision (g), CitiMortgage argues: "[CitiMortgage] was under no duty to review further loan modification application [*sic*] from [Rossetta] after it denied [Rossetta] for a HAMP loan modification in writing in 2012, which [Rossetta] failed to appeal." We assume without deciding that Civil Code section 2923.6, subdivision (g), offers an affirmative defense to negligence in loan modification cases. [17] Even so assuming, facts necessary to establish the affirmative

---

[17] Civil Code section 2923.6, subdivision (g), which has an effective date of January 1, 2013, provides: "In order to minimize the risk of borrowers submitting multiple applications for first lien loan modifications for the purpose of delay, the mortgage servicer shall not be obligated to evaluate applications from borrowers who have already been evaluated or afforded a fair opportunity to be evaluated for a first lien loan

39

defense do not appear in the complaint. CitiMortgage's contention that Rossetta failed to appeal from the denial of her loan modification applications suffers from the same defect. Whatever the merits of these arguments, they are inappropriate for resolution at the demurrer stage. (*Noguera v. North Monterey County Unified Sch. Dist.* (1980) 106 Cal.App.3d 64, 66 [matters outside the complaint will not be considered in evaluating a demurrer]; see also *Matteson v. Wagoner* (1905) 147 Cal. 739, 744 [where only part of the facts necessary to an affirmative defense appear in a complaint, the complaint is not rendered vulnerable to a general demurrer].) We therefore conclude the trial court erred in sustaining the demurrer to Rossetta's negligence cause of action.

## G.     *Intentional Infliction of Emotional Distress*

Rossetta contends the alleged mishandling of her application for a loan modification gave rise to a cause of action for intentional infliction of emotional distress. "The elements of a prima facie case for the tort of intentional infliction of emotional distress are: ' " (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.' " (*Melorich Builders, Inc. v. Superior Court* (1984) 160 Cal.App.3d 931, 935-936.)

"The standard set for measuring outrageous conduct indicates the qualifying conduct must be so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community." (*Melorich Builders, Inc. v. Superior Court, supra,* 160

---

modification prior to January 1, 2013, or who have been evaluated or afforded a fair opportunity to be evaluated consistent with the requirements of this section, unless there has been a material change in the borrower's financial circumstances since the date of the borrower's previous application and that change is documented by the borrower and submitted to the mortgage servicer."

40

Cal.App.3d at p. 936.) The complaint alleges CitiMortgage acted outrageously by leading Rossetta, a cancer survivor, to believe she would receive a loan modification, making material misrepresentations concerning the status of her loan modification applications, and mishandling her application materials.

The mishandling of a loan modification may, in some circumstances, constitute conduct so outrageous as to allow a cause of action for intentional infliction of emotional distress. (See, e.g., *Ragland v. U.S. Bank Nat. Assn.* (2012) 209 Cal.App.4th 182, 188-189 [denying summary judgment on cause of action for intentional infliction of emotional distress where a trier of fact could find the lender induced the borrower to default, purposefully refused payment, then sold the home in foreclosure].) But Rossetta's allegations do not rise to that level. (See, e.g., *Helmer v. Bank of America, N.A.* (E.D. Cal. Mar. 22, 2013, No. CIV S-12-0733 KJM-GGH) 2013 U.S. Dist. LEXIS 40707, *16-17 [allegation that lender induced borrower to default was not sufficient to show reckless or intentional behavior]; *Becker v. Wells Fargo Bank, N.A.* (E.D. Cal. Nov. 30, 2012, No. 2:10-cv-02799 LKK KJN PS) 2012 U.S. Dist. LEXIS 170729, *48 [allegation that lender failed to make good on alleged promise to grant loan modification quickly if borrower followed certain instructions was not sufficiently outrageous to support cause of action for intentional infliction of emotional distress]; *Mehta v. Wells Fargo Bank, N.A.* (S.D. Cal. 2010) 737 F.Supp.2d 1185, 1204 [allegation that mortgage lender broke a promise not to foreclose during pendency of an application for a loan modification was not sufficiently outrageous to support cause of action for intentional infliction of emotional distress].)

Although Rossetta undoubtedly suffered frustration and anxiety in her attempts to secure a loan modification, the alleged mishandling of her loan modification applications does not constitute conduct so extreme, outrageous, or outside the bounds of civilized society as to support a cause of action for intentional infliction of emotional distress, even assuming CitiMortgage knew she was battling cancer. The trial court properly sustained

41

the demurrer to the cause of action for intentional infliction of emotional distress without leave to amend.

## H. Unfair Competition Law

Next, Rossetta argues the trial court erred in sustaining the demurrer to her cause of action for violations of the Unfair Competition Law, Business and Professions Code section 17200 et seq. The trial court sustained the demurrer on the grounds that the complaint fails to allege an underlying unfair practice and fails to allege facts establishing that Rossetta has standing to bring an Unfair Competition Law cause of action. Rossetta challenges both of these determinations. We address them, as Rossetta does, in reverse order.

### 1. Standing

A private party has standing to bring a Unfair Competition Law action only if he or she "has suffered injury in fact and has lost money or property as a result of the unfair competition." (Bus. & Prof. Code, § 17204 (section 17204).) To plead standing, a plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice . . . that is the gravamen of the claim." (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 322.) There are "innumerable ways in which economic injury from unfair competition may be shown. A plaintiff may (1) surrender in transaction more, or acquire in a transaction less, than he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary." (*Id.* at p. 323.) "It suffices to say that . . . a private plaintiff filing suit . . . must establish that he or she has personally suffered [economic] harm." (*Ibid.*)

Relying on *Bushell* Rossetta argues she suffered economic harm as a result of the time and money she spent responding to CitiMortgage's demands. CitiMortgage

responds that *Bushell* does not address standing under section 17204 and, in any case, wasted time does not constitute an economic injury. These points, though well-taken, do not resolve the question of standing as they do not address the argument that Rossetta spent money pursuing a loan modification. (See *Reichman v. Poshmark, Inc.* (S.D. Cal. Jan. 3, 2017, No. 16-cv-2359 DMS (JLB)) 2017 U.S. Dist. LEXIS 36371, *16 ["waste of time, aggravation, and stress do not constitute loss or deprivation of money or property sufficient to satisfy the economic injury requirement"].)

As previously discussed, costs incurred in preparing and assembling materials for a single loan modification application (e.g., copy costs and postage) fail to establish the element of damages under the maxim de minimis non curat lex—the law does not concern itself with trifles. (See *Lueras, supra,* 221 Cal.App.4th at p. 79.) But the question of injury-in-fact is different from the question of damages. (See *Clayworth v. Pfizer, Inc.* (2010) 49 Cal.4th 758, 789 [section 17204 does not require "that plaintiffs prove compensable loss at the outset"].) To establish standing under section 17204, a plaintiff need only "allege an ' "identifiable trifle" ' [citation] of economic injury." (*Kwikset Corp. v. Superior Court, supra,* 51 Cal.4th at p. 330, fn. 15.) We conclude the complaint adequately alleges the required trifle.[18]

The complaint alleges Rossetta spent "a significant amount of time, energy and *resources* in her attempts to obtain the loan modifications." (Italics added.) The term "resources" encompasses both economic and non-economic losses, and is therefore vague as to whether Rossetta suffered the requisite economic harm. (See Meriam-Webster's

---

[18] The *Lueras* court concluded that costs incurred in preparing and assembling materials for a loan modification application are "de minimis" and "not sufficient to qualify as injury in fact under section 17204." (*Lueras, supra,* 221 Cal.App.4th at p. 82.) Although we agree with the court's characterization of such costs as "de minimis," we respectfully disagree with the conclusion that "de minimis" costs cannot constitute injury-in-fact for purposes of section 17204.

43

Collegiate Dict. (11th ed. 2006) p. 1061, col. 2 [defining "resource" to include "a source of supply or support," "a natural source of wealth or revenue," "a natural feature or phenomenon that enhances the quality of human life," "something to which one has recourse in difficulty," "a possibility of relief or recovery" and "an ability to meet and handle a situation"].) However, the complaint also alleges Rossetta repeatedly sent documents to CitiMortgage via United Parcel Service (UPS), and attaches the relevant invoices. Reading these allegations liberally, and construing them in the context of the complaint as a whole, we conclude Rossetta sufficiently alleges she suffered economic harm as a result of the alleged mishandling of her loan modification application materials.[19] We therefore conclude Rossetta adequately alleges standing to pursue a cause of action under the Unfair Competition Law.

> 2. *Fraudulent and Unfair Practices*

Having concluded that Rossetta has standing, we next consider whether the complaint alleges a cause of action under the Unfair Competition Law. The Unfair Competition Law prohibits any "unlawful, unfair or fraudulent business act or practice." (Bus. & Prof. Code, § 17200.) Because the statute is written in the disjunctive, it prohibits three separate types of unfair competition: (1) unlawful acts or practices, (2) unfair acts or practices, and (3) fraudulent acts or practices. (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 (*Cel-Tech*).) The trial court concluded the complaint fails to allege a cause of action under any prong.

Relying on *Majd v. Bank of America, N.A.* (2015) 243 Cal.App.4th 1293 (*Majd*), Rossetta argues the complaint alleges a cause of action under the "fraud" and "unfair" prongs. Specifically, Rossetta argues CitiMortgage violated the fraud and unfair prongs

---

[19] We decline to consider Rossetta's alternative argument that she incurred economic harm as a result of having incurred fees and penalties which are not alleged to have been paid.

by denying her application for a loan modification on the "false" grounds that she failed to submit necessary documents.  The trial court did not consider this theory, which Rossetta offers for the first time on appeal.  (See *Dudley v. Department of Transportation* (2001) 90 Cal.App.4th 255, 259 [appellant may advance a new theory as to why the allegations of the complaint state a cause of action on appeal from a demurrer dismissal without leave to amend].)  We conclude the complaint adequately alleges a cause of action under the "fraud" and "unfair" prongs of the Unfair Competition Law.[20]

"A business practice is 'fraudulent' within the meaning of [Business and Professions Code] section 17200 if it is 'likely to deceive the public.  [Citations.]  It may be based on representations to the public which are untrue, and " 'also those which may be accurate on some level, but will nonetheless tend to mislead or deceive. . . .  A perfectly true statement couched in such a manner that is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under' " the [Unfair Competition Law].  [Citations.]  The determination as to whether a business practice is deceptive is based on the likely effect such practice would have on a reasonable consumer.' " (*Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1380.)  "A 'fraudulent' activity includes any act or practice likely to deceive the public, even if no one is actually deceived." (*Jolley, supra,* 213 Cal.App.4th at p. 907; see *Brakke v. Economic Concepts, Inc.* (2013) 213 Cal.App.4th 761, 772 [" 'Unlike common law fraud, a Business and Professions Code section 17200 violation can be shown even without allegations of actual deception, reasonable reliance and damage' "].)

Our Supreme Court has not yet established a test for determining whether a business practice in a consumer case is "unfair."  (See *Zhang v. Superior Court* (2013) 57

---

[20] Rossetta does not contend—and we do not consider—whether the complaint adequately alleges a cause of action under the "unlawful" prong of the Unfair Competition Law.

Cal.4th 364, 380, fn. 9 ["The standard for determining what business acts or practices are 'unfair' in consumer actions under the [Unfair Competition Law] is currently unsettled"].) Prior to the Supreme Court's opinion in *Cel-Tech,* courts applied a balancing test to determine whether a practice was "unfair" under the Unfair Competition Law. (See, e.g., *Klein v. Earth Elements, Inc.* (1977) 59 Cal.App.4th 965, 969-970.) Specifically, courts would balance the impact of the practice on the alleged victim, against the reasons, justifications and motives of the alleged wrongdoer. (*Ibid.*) The Supreme Court rejected this approach in *Cel-Tech*, an anti-competitive practices case, holding that a cause of action for unfair business practices must "be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." (*Cel-Tech, supra,* 20 Cal.4th at pp. 186-187.) Although *Cel-Tech* disapproved of consumer cases applying the balancing test, the Supreme Court expressly limited its holding to anti-competitive practices cases, stating: "Nothing we say relates to actions by consumers." (*Id.* at p. 187, fn. 12.) Following *Cel-Tech*, a split in authority has developed concerning the standard for consumer claims under the "unfair" prong of the Unfair Competition Law. (Compare *Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 718-719 [adopting the balancing test] with *Gregory v. Albertson's, Inc.* (2002) 104 Cal.App.4th 845, 854 [adopting the "tether[ing]" test]; see also *Camacho v. Automobile Club of Southern California* (2006) 142 Cal.App.4th 1394, 1403 [adopting the test for unfairness set forth in 15 U.S.C. § 45(n)].) Another panel of this court has adopted the balancing test (*Progressive West Ins. Co. v. Superior Court* (1999) 135 Cal.App.4th 263, 285-286) and, in the absence of any discussion of the appropriate standard by the parties, we do the same.

The complaint alleges CitiMortgage subjected Rossetta to a fraudulent application process, stringing her along with false assurances that a loan modification would be forthcoming, and then claiming, also falsely, that Rossetta failed to supply requested documents. The complaint further alleges that CitiMortgage intentionally delayed the

46

application process by demanding that Rossetta submit the same documents over and over again, all in an attempt to increase arrears, penalties, and fees, resulting in an incurable default. These allegations adequately support a cause of action under the "fraudulent" and "unfair" prongs of the Unfair Competition Law. (See *Rufini, supra,* 227 Cal.App.4th at p. 310 [allegation that lender "pretended to engage in loan modification efforts while actually intending to foreclose" stated Unfair Competition Law cause of action under "fraudulent" and "unfair" prongs]; *Majd, supra,* 243 Cal.App.4th at p. 1304 [borrower sufficiently alleged violation of the Unfair Competition Law based, in part, on lender's false assertion that he failed to provide required documentation].) We therefore conclude the trial court erred in sustaining the demurrer to the Unfair Competition Law cause of action.[21]

## I.    *Conversion*

Finally, Rossetta contends the trial court erred in sustaining the demurrer to the cause of action for conversion in the first amended complaint.[22] Rossetta's conversion cause of action is based on the theory that the assignment of the deed of trust to CitiMortgage in October 2012 was invalid. The trial court correctly sustained the demurrer to Rossetta's conversion cause of action.

---

[21] We reject CitiMortgage's argument, based on *Mangini, supra,* 230 Cal.App.3d at pp. 1155-1156, that the Unfair Competition Law only applies to ongoing conduct. As the Court of Appeal for the First District, Division Three, has explained, in rejecting an identical argument: "That was the state of the law when *Mangini* was decided, but the following year the Legislature amended [Business and Professions Code] section 17200 to state that it applies to any unlawful ' "*act* or practice," presumably permitting invocation of the [Unfair Competition Law] based on a single instance of unfair conduct.' " (*Rufini, supra,* 227 Cal.App.4th at p. 311.)

[22] During oral argument, Rossetta's counsel informed the court that the claim for declaratory relief was "moot." Without deciding whether this claim is properly characterized as moot, we accept Rossetta's representation that the claim has been abandoned.

"An essential step in the process of securitizing a loan is the transfer of the promissory note and deed of trust into a trust." (*Mendoza v. JPMorgan Chase Bank, N.A.* (2016) 6 Cal.App.5th 802, 806.)[23] The complaint implies that Rossetta's loan, which closed in September 2005, was eligible for inclusion in the 2006-1 Trust, which closed on August 30, 2006. However, there is nothing in the record to suggest that CitiMortgage attempted or intended to securitize the loan. To the contrary, the judicially noticeable assignments reveal that MERS assigned the deed of trust to CitiMortgage on October 12, 2012, and CitiMortgage assigned the deed of trust to the M4 REMIC Trust 1 on April 1, 2014. The complaint does not allege—and nothing suggests—that CitiMortgage attempted or intended to securitize the loan by transferring the promissory note and deed of trust to the 2006-1 Trust.

The parties devote considerable attention to the question, left open by our Supreme Court's recent opinion in *Yvanova v. New Century Mortgage Co.* (2016) 62 Cal.4th 919, as to whether a borrower has standing to bring a preemptive action challenging the validity of a deed of trust assignment to a foreclosing party. (*Id.* at pp. 924, 943 [holding that a borrower has standing to challenge a nonjudicial foreclosure based on errors in the assignment by which the foreclosing party purportedly took a beneficial interest in the deed of trust, but leaving open the question whether a borrower has standing in the pre-foreclosure context]; and compare *Saterbak v. JPMorgan Chase Bank, N.A., supra*, 245 Cal.App.4th at p. 815 [holding California law precludes borrowers

---

[23] "Mortgage-backed securities are created through a complex process known as 'securitization.' (See Levitin & Twomey, *Mortgage Servicing* (2011) 28 Yale J. on Reg. 1, 13 ['a mortgage securitization transaction is extremely complex . . .'].) In simplified terms, 'securitization' is the process where (1) many loans are bundled together and transferred to a passive entity, such as a trust, and (2) the trust holds the loans and issues investment securities that are repaid from the mortgage payments made on the loans. [Citation.] Hence, the securities issued by the trust are 'mortgage-backed.' " (*Glaski v. Bank of America* (2013) 218 Cal.App.4th 1079, 1082, fn. 1.)

from bringing preemptive actions to determine whether foreclosing parties have authority to foreclose because such actions " 'would result in the impermissible interjection of the courts into a nonjudicial scheme [i.e. nonjudicial foreclosures] enacted by the California Legislature' "] with *Lundy v. Selene Finance, LP* (N.D. Cal. Mar. 17, 2016, No. 15-cv-05676-JST) 2016 U.S. Dist. LEXIS 35547, *39-40 [predicting that the California Supreme Court would likely limit a bar on pre-foreclosure suits only to "plaintiffs who lack any 'specific factual basis' for bringing their claims"].)  We need not decide whether Rossetta has standing to challenge alleged deficiencies in the assignment of the deed of trust from MERS to the 2006-1 Trust because, on the face of the complaint, there was no such assignment.  We therefore conclude the trial court properly sustained the demurrer to the cause of action for conversion without leave to amend.

### III.  DISPOSITION

The judgment of dismissal in favor of CitiMortgage is reversed.  The order sustaining the demurrer is affirmed in part and reversed in part.  The order is reversed as to the causes of action for negligence (fifth cause of action) and violations of the Unfair Competition Law (seventh cause of action).  The trial court is directed to grant Rossetta leave to amend the causes of action for intentional misrepresentation (first cause of action) and promissory estoppel (fourth cause of action).  In all other respects, the judgment is affirmed.  The parties shall bear their own costs on appeal.

/S/

RENNER, J.

I concur:

/S/

MURRAY, J.

49

Mauro, Acting P. J., Concurring.


I agree with the majority opinion in all respects except for part II. F. of the Discussion pertaining to negligence.  As to that part, I concur in the ultimate conclusion—that Rossetta has stated a cause of action for negligence—but I write separately because I believe a lender's mere receipt or review of a borrower's loan modification application is not enough to create a changed relationship that may give rise to a tort duty of care.  More is required to impose a tort duty on a lender.

Rossetta alleges in her second amended complaint that CitiMortgage negligently mishandled her loan modification applications.  As the majority opinion explains, the elements of a cause of action for lender negligence begin with whether the lender had a duty to exercise due care.  (See *Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 500.) (Maj. opn., *ante*, at p. 31.)

This court has recognized the long-standing general rule that "a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money." (*Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089, 1096 (*Nymark*).)  In *Nymark*, this court explained:  " 'Liability to a borrower for negligence arises only when the lender "actively participates" in the financed enterprise "beyond the domain of the usual money lender." ' [Citations.]"  (*Ibid.*, quoting *Wagner v. Benson* (1980) 101 Cal.App.3d 27, 35; see also *Connor v. Great Western Sav. & Loan Assn.* (1968) 69 Cal.2d 850, 864 ["Great Western became much more than a lender content to lend money at interest on the security of real property.  It became an active participant in a home construction enterprise."].)  Although courts have since sought to clarify the *Nymark* holding (see, e.g., *Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872, 901 (*Jolley*) ["the no-duty rule is only a general rule"]), there remains a

1

recognition that something beyond the scope of conventional lending must occur to move a lender's contractual relationship with the borrower into the realm of tort responsibility.

Based on Rossetta's well-pleaded allegations, which we must accept as true in reviewing an order sustaining a demurrer without leave to amend (*People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 300), I agree with the majority that CitiMortgage engaged in acts and omissions that went beyond the scope of conventional lending, thereby giving rise to a duty of due care in this case. But I do not agree that a lender's mere receipt or review of a borrower's loan modification application creates a changed relationship that may give rise to a tort duty of care. (Cf. Maj. opn., *ante*, at pp. 32 ["courts are divided on the question of whether accepting documents for a loan modification is within the scope of a lender's conventional role as a mere lender of money, or whether, and under what circumstances, it can give rise to a duty of care with respect to the processing of the loan modification application."]; 35 [describing the decision in *Alvarez v. BAC Home Loans Servicing, L.P.* (2014) 228 Cal.App.4th 941 to hold that "when a lender agrees to consider a borrower's application for a loan modification, the *Biakanja* factors weigh in favor of imposing a duty of care"]; 35 ["we are persuaded by the reasoning in *Alvarez*."]; 36 ["we are convinced that a borrower and lender enter into a new phase of their relationship when they voluntarily undertake to renegotiate a loan"]; ["we conclude that the change in the parties' relationship can and should be factored into our application of the *Biakanja* factors"].) Rather, I believe the lender's willingness to receive or review a loan modification application is more like a nonbinding "invitation to treat" in contract law. As the majority acknowledges, the lender has no duty to offer or approve a loan modification (*Lueras v. BAC Home Loans Servicing, LP* (2013) 221 Cal.App.4th 49, 68 (*Lueras*); *Jolley, supra,* 213 Cal.App.4th at p. 903) and no duty to act on the loan modification application in any particular time frame. (*Anderson v. Deutsche Bank Nat'l Trust Co. Ams.* (9th Cir. 2016) 649 Fed.Appx. 550, 552.) (Maj. opn., *ante*, at pp. 32, 33.) Thus, although there is a split in authority as

2

described in the majority opinion, I agree with the decisions holding that when a lender receives or reviews a loan modification application, without more, it is acting within its conventional role and owes no duty of care to the borrower. (*Marques v. Wells Fargo Bank, N.A.* (N.D.Cal. Oct. 13, 2016, No. 16-cv-03973-YGR) 2016 WL 5942329, *8; *Garcia v. PNC Mortgage* (N.D.Cal. Sept. 16, 2015, No. 14-cv-3543-PJH) 2015 WL 5461563, *3; *Hernandez v. Select Portfolio, Inc.* (C.D.Cal. June 25, 2015, No. CV 15-01896 MMM (AJWx) 2015 WL 3914741, *22; *Lueras, supra,* 221 Cal.App.4th at p. 67.)

Here, however, Rosetta alleges CitiMortgage did more than merely receive or review her loan modification applications. She alleges CitiMortgage refused to consider her for a loan modification unless she was three months behind in her mortgage payments, required her to submit duplicate or nonexistent documents, lost or mishandled her documents, and misstated the status of her applications, causing her damages. Under the circumstances, Rossetta states a cause of action for negligence.


       MAURO       , Acting P. J.

3